*E-FILED: August 19, 2013*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LUIS HERNANDEZ and CINDY CALDERON, | No. C12-02952 HRL |
| Plaintiffs,<br>v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| THE CITY OF SAN JOSE; THE SAN JOSE POLICE DEPARTMENT ("SJPD"); ERNIE ALCANTAR, individually and in his official capacity as Captain, SJPD; and JAMES WERKEMA, individually and in his official capacity as Lieutenant, SJPD, | [Re: Docket No. 24] |
| Defendants. | |

Plaintiffs Luiz Hernandez and Cindy Calderon sue for alleged violation of their state and federal constitutional rights to free speech and free association. Defendants move for summary judgment. Plaintiffs oppose the motion. All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); FED. R. CIV. P. 73. Upon consideration of the moving and responding papers, as well as the arguments of counsel, the court grants the motion.[1]

---

[1] The court's rulings on defendants' evidentiary objections will be filed concurrently in a separate document.

BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

Plaintiffs Luiz Hernandez and Cindy Calderon are officers with the San Jose Police Department (SJPD). They were patrol partners and are good friends.

Officer Luis Hernandez

Hernandez has been employed as a police officer with the SJPD since June 1990. In September 2005, he was assigned to work at the San Jose Airport. Subsequently, he was given an administrative assignment to coordinate the Aviation Security overtime. In that assignment, Hernandez worked under the supervision of Sgt. Richard Brooks. Overtime assignments were made based on a rotation of positions to help ensure that all officers worked a fair share of overtime shifts.

Around September or October 2007, Hernandez says that Sgt. Jaime Zarate approached him and asked for special consideration for overtime assignments. At that time, Zarate was the administrative sergeant for the airport division, in charge of vacation time-off and back-filling regular overtime positions. Hernandez was aware that Zarate had secondary employment as the Police Coordinator for the San Jose Unified School District. He believed that Zarate was asking to be scheduled for overtime shifts that he would submit a time sheet for, but which he had no intention of actually working. And, Hernandez understood that, in return, Zarate would also grant him similar favors with respect to vacation time off and regular overtime assignments. Hernandez says that he told Zarate that airport overtime assignments were made on a rotation basis and, further, that he did not want to get involved in Zarate's schemes.

Sometime later, Loretta Bloom, an Airport Police Department clerk, asked Hernandez for his opinion about alleged discrepancies in Zarate's time sheets. Hernandez told Bloom that he did not know the first thing about time sheets, and that if there was an issue with Zarate's paperwork, Bloom should speak with Lt. Werkema about it. (Richardson Decl., Ex. A (Hernandez Depo. at 53:1-25)). Hernandez says that Bloom mentioned that she suspected time sheet fraud, but did not provide details. (Id. at 54:3-8). Hernandez claims that she did,

2

1  however, give him a sheaf of papers purporting to show that Zarate used SJPD funds to buy
2  gardening equipment, even though the airport had its own gardening service.

3  Shortly after this encounter with Bloom, Lt. Werkema called Hernandez into his office
4  to discuss Hernandez's issues with Zarate. Hernandez testified that, during that meeting, he
5  "didn't say anything about Zarotti [sic] other than my personal opinion . . . that I felt [Zarate]
6  was a thief." (Richardson Decl., Ex. A (Hernandez Depo. at 79:25-80:1, 5-6)). Hernandez told
7  Werkema that Bloom had approached him about alleged discrepancies in Zarate's time sheets,
8  but that he told her to talk to Werkema because he had "nothing to do with this." (Id. at 59:4-5).
9  He further testified that he did not say anything about his prior encounter with Zarate or
10 Zarate's alleged request for special consideration for airport overtime shifts. Nor did he ever go
11 back to Werkema to tell him about that incident. (Id. at 59:6-19)). Indeed, Hernandez says that
12 when he met with Werkema, he did not believe Zarate was violating city policy or breaking the
13 law, and he had no facts indicating that Zarate had actually done anything illegal. (Id. at 60:14-
14 20; 80:7-11). He testified that the meeting with Werkema, however, "made me look like I had
15 actually reported something against Zarotti [sic] when I hadn't done a damn thing." (Id. at
16 77:11-13).

17  About two days later, Werkema reassigned Hernandez to report directly to Zarate.
18 Hernandez claims that he again told Zarate that he would not change his method for assigning
19 airport overtime shifts and would not participate in any way in any time sheet fraud.

20  Two weeks later, Hernandez's administrative duties were given to Sgt. Joe Hernandez,
21 and Hernandez was reassigned to work on the airport patrol team, a position that he says was
22 less desirable than the one he had held. Upon his reassignment to patrol, Hernandez says that
23 he told his new supervisor, Sgt. Bob St. Amour, that Werkema would probably contact him and
24 try to make him seem like a bad employee. Hernandez claims that he later learned that
25 Werkema approached St. Amour and tried to discredit Hernandez. Nevertheless, Hernandez
26 says that St. Amour assured him that he evaluated officers based solely on merit.

27  At around this time, Hernandez's annual performance review was due. Sgt. Brooks
28 prepared one evaluation for the periods October 19, 2005 through October 18, 2006 and

September 13, 2007 through March 13, 2008. Brooks gave Hernandez a rough draft of the evaluation he intended to submit, with an overall evaluation of "Above Standard." Hernandez alleges that Brooks later told him that Werkema ordered him to lower his final overall evaluation to "Meets Standard," albeit the written portion of the evaluation would reflect an "Above Standard" performance. (Complaint ¶¶ 22, 25). Hernandez believes that Werkema did so in order to keep him from being placed in the SJPD's field training program, a specialized unit within the department. (Hernandez Decl. ¶ 29). Werkema testified that he did not order Brooks to lower Hernandez's evaluation; rather, Werkema claims that he told Brooks that he needed specific documentation to support the "Above Standard" rating, to which Brooks reportedly replied, "I don't have any." (Richardson Decl., Ex. B (Werkema Depo. at 71:10-22)). In any event, Hernandez signed the final version of his evaluation with the "Meets Standard" rating. And, notwithstanding the "Meets Standard" evaluation, Hernandez was accepted into the SJPD's field training program.

Around January 2010, at a time when Hernandez was reporting to Sgt. Elvander, Capt. Alcantar called Hernandez in for a meeting. During that meeting, which Elvander also attended, Alcantar confronted Hernandez about Hernandez's alleged refusal to acknowledge Alcantar's morning greeting. Hernandez believed that Alcantar's morning greeting was merely a pretense for calling the meeting; and, at one point, when Alcantar asked if Hernandez preferred that they just not speak with one another at all, Hernandez replied that would suit him just fine. Alcantar then mentioned the investigation that had commenced as to Zarate. According to Hernandez, Alcantar said that he had been approached by friends who told him what Hernandez had been saying about Zarate, and Alcantar told Hernandez, "[Y]ou don't know anything about it. So you need to keep your mouth shut." (Richardson Decl., Ex. A (Hernandez Depo. at 20:15-25). Hernandez further testified that Alcantar also "began to brag to me about how he knows a lot of people, and if he wanted to do me he could have done me at that point because of the things I said about [Zarate]." (Id. at 20:8-11). Alcantar, on the other hand, testified that he told Hernandez, "The thing with Jaime Zarate, don't talk about that while you're at work because it's distracting, and that undermines the morale because it just fuels

4

1  rumors." (Bourke Decl., Ex. A (Alcantar Depo. at 87:21-24).  According to Alcantar, he had
2  given the same directive to other personnel in similar situations in the past, at the direction of
3  the chief officer at the time.  (Id. at 87:25-88:3).  Alcantar retired from the SJPD some six
4  months later in June 2010.

5        Plaintiffs claim that the SJPD's investigation of Zarate's alleged time sheet fraud was a
6  whitewash because some of the investigating officers also had secondary employment with the
7  San Jose Unified School District and reported to Zarate in those jobs.  Additionally, plaintiffs
8  say that neither of them was ever interviewed by the investigating officers.

9        In July 2010, Hernandez applied for a position with the Gang Investigations Unit (GIU),
10 which was led by Lt. John Spicer.  The test was scheduled for July 14-15, 2010.  Hernandez
11 told SJPD that he would be out of town on vacation, returning on July 15.  In fact, he returned
12 on July 13 and requested that his test time be scheduled for July 15.  Hernandez says that one
13 Sgt. Bortolotti initially told him that would not be a problem, but then later reported that Spicer
14 said testing would be conducted based on seniority.  Consequently, Hernandez was scheduled to
15 be the first person tested on July 14.  Hernandez claims that he had never seen a situation where
16 seniority was the only criteria for test scheduling.  Additionally, he says that, in violation of
17 SJPD procedures, he was asked questions about material that had never been provided to him in
18 preparation for the test.  He did not receive a score high enough for placement in the GIU.

19       The following month, Hernandez applied for assignment to the Family Violence Unit
20 (FVU), led by Lt. John Rose.  Because he harbored suspicions about the testing in this unit,
21 Hernandez says that he asked that his exam be scheduled for the last day of testing.  Again,
22 Hernandez says that he initially was told it would not be a problem, but then was notified a few
23 days later that scheduling was based on seniority and he was to be the second officer scheduled
24 on the first day of testing.  Following the exam, Hernandez placed eleventh on the eligibility
25 list, but was not selected for assignment to the unit.

26       Hernandez says that due to a number of on-the-job injuries, he required several surgeries
27 and time off for rehabilitation.  When he ran out of disability time, his usual practice was to use
28 his compensatory time off.  In about October 2010, Hernandez says that, contrary to past

United States District Court
For the Northern District of California

5

1  practice, Lt. Francisco Aviles told him that he had to use sick time, not compensatory time, for
2  his rehabilitation. After Hernandez contacted San Jose's risk management office, he was
3  permitted to use compensatory time for those days off.

Officer Cindy Calderon

Calderon has been employed as a police officer with the SJPD since 1990. She claims that, because of her friendship with Hernandez, she suffered retaliation in the following ways:[2]

In deposition, Calderon claimed that she received a failing score on her 2008 sergeant's examination because of her friendship with Hernandez. Because she had passed a sergeant's exam two years earlier in 2006, Calderon believes that her 2008 failing score was due to retaliation because Hernandez spoke about Zarate.

In July 2010, she also applied for assignment with the GIU. She was later told that she failed the exam. Calderon claims that the test scoring was rigged in such a way to keep her out of the unit and that this was done at the direction of Alcantar because Hernandez spoke about Zarate's alleged time sheet fraud. She says that she had never before failed a unit test, and that she previously received a Letter of Commendation from the GIU on work she did. Although she says that the commendation ordinarily would have entitled her to five points on her score, Lt. Spicer reportedly told her that they did not use reports in scoring. Additionally, Calderon says that Spicer refused to discuss her test scores, which she claims were based entirely on subjective criteria. She also claims that the answers to some questions she was asked were not in the preparation materials she was given.

In August 2010, Calderon applied for assignment with the FVU. She placed fourth on the eligibility list, but was not one of the two people accepted to the unit. Calderon believes that the test scoring was rigged in such a way to keep her out of the unit. She claims that she had seniority over the three officers ahead of her on the list and that they had significantly less investigative experience than her. Additionally, Calderon says that her seniority should have added 9.8 points to her score. She claims that no one would speak to her about her scores and

---

[2] Although Calderon now says that she, too, spoke about Zarate's alleged time sheet fraud with persons inside and outside SJPD, the complaint alleges only that she was retaliated against because of her friendship with Hernandez.

6

that she was kept out of the unit at Alcantar's behest in retaliation for Hernandez's speaking about Zarate's alleged time sheet fraud.

On November 5, 2010, patrol officers were required to wear their Battle Dress Uniform (BDU). Calderon did not have her BDU and claims that Lt. McGrady said she would either be sent home or reassigned—both punitive measures. Calderon chose to be sent home and says that she had to use personal time off for that day. She says that she later learned that other officers had also shown up at work without their BDUs, but were allowed to go home to get them and report back to duty. Lt. Aviles later directed her to come to his office to show him her BDU. Calderon offered to show him her receipt for her BDU, which she claims ordinarily would have been sufficient proof that she had one. Aviles, however, reportedly refused to look at the receipt and ordered her to show him the actual BDU. Calderon claims that she was singled out over these trivial uniform issues in retaliation for Hernandez's speaking about Zarate's alleged time sheet fraud.

The Instant Lawsuit

On June 7, 2012, Hernandez and Calderon filed this lawsuit, alleging two claims for relief against the City of San Jose, the SJPD, Werkema and Alcantar. The first is brought pursuant to 42 U.S.C. § 1983 based on the alleged violation of their First Amendment rights to free speech and free association. The second alleges violation of plaintiffs' parallel state law rights under California Constitution, Article I §§ 1 & 2.

Defendants move for summary judgment on the ground that claims based on conduct that occurred before June 7, 2010 are time-barred. Additionally, defendants contend that the speech that forms the basis of plaintiffs' claims is not protected and that, even if it was, plaintiffs do not have sufficient evidence establishing that the complained-of acts were done in retaliation for that speech.

LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears

7

the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

DISCUSSION

A.   Claims based on conduct that occurred before June 7, 2010

The limitations period for § 1983 claims, borrowed from California's personal injury statute of limitations, is two years. Alameda Books, Inc. v. City of Los Angeles, 631 F.3d 1031, 1041 (9th Cir. 2011); CAL. CODE CIV. PROC. § 335.1. Plaintiffs' complaint was filed on June 7, 2012, and defendants contend that any claims based on events that occurred before June 7, 2010

are time-barred. Plaintiffs argue that acts occurring prior to the limitations period are actionable under the continuing violations doctrine.

"The continuing violations doctrine permits a plaintiff to sue for all discriminatory acts that occurred during the limitations period, even if the policy or other event giving rise to the discrimination occurred outside the limitations period." The Committee Concerning Community Improvement v. City of Modesto, 583 F.3d 690, 701 (9th Cir. 2009). "A plaintiff must show that a pattern or practice of discrimination creates an ongoing violation." Id. However, the continuing violation doctrine does not apply to claims based on discrete discriminatory acts rather than a hostile work environment, even where those acts relate to alleged acts that occurred within the statutory time period. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L.Ed.2d 106 (2002). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 114. By contrast, hostile environment claims, by "[t]heir very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day." Id. at 115 (citations omitted). "It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." Id. (citations omitted).

Thus, "discrete discriminatory acts will not create a pattern of discrimination without more; pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on 'discriminatory conduct that is widespread.'" The Committee Concerning Community Improvement, 583 F.3d at 701 (quoting Cherosky v. Henderson, 330 F.3d 1243, 1247 (9th Cir. 2003)). "In considering statute of limitations issues, the court is to 'look at when the operative decision occurred' and to 'separate from the operative decisions those inevitable consequences that are not separately actionable.'" Id. (quoting RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1058 (9th Cir. 2002)).

9

1    Here, plaintiffs' claims are based, in part, on separate and distinct acts occurring over a three-year period—Hernandez's transfer to report directly to Zarate; his reassignment to the Patrol Division; the alleged lowering of his overall evaluation to "Meets Standard"; his January 2010 meeting with Alcantar in which Hernandez claims that Alcantar ordered him to stop talking about Zarate; and Calderon's failing score on the 2008 sergeant's exam. These are discrete acts to which the continuing violations doctrine does not apply. See Morgan, 536 U.S. at 114. Nevertheless, plaintiffs are not precluded from using these prior acts as background evidence in support of their timely claims. Id. at 113.

B.   First Amendment Claim

First Amendment retaliation claims are analyzed under a sequential five-part test—the first two prongs of which "address whether the speech should be protected under the First Amendment, while the last three address whether that protected speech caused some retaliatory response." Huppert v. City of Pittsburg, 574 F.3d 696, 703 (9th Cir. 2009). Thus, in evaluating such claims, courts consider: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009). Because these are sequential steps, the failure to satisfy any one necessarily ends the inquiry. Huppert, 574 F.3d at 703.

1.   Whether Hernandez spoke on a matter of public concern

Plaintiffs bear the burden of showing that the speech in question addressed an issue of public concern. Eng, 552 F.3d at 1070. "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." Id. (citations omitted). "But speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." Id. (citations omitted). "Whether

10

1    an employee's speech addresses a matter of public concern must be determined by the content,
2    form, and context of a given statement, as revealed by the whole record." Id. In evaluating the
3    nature of the speech at issue, however, "content is the most important factor." Anthoine v.
4    North Coast Counties Consortium, 605 F.3d 740, 748 (9th Cir. 2010). The public concern
5    inquiry is purely a question of law. Eng, 552 F.3d at 1070.

6    Defendants move for summary judgment on the ground that Hernandez's comment to
7    Werkema that he felt Zarate was "a thief" is not protected speech. Indeed, according to
8    Hernandez's own testimony, that comment was purely his personal opinion: "I didn't say
9    anything about Zarotti [sic] other than my personal opinion. . . . I didn't say a word to the plan
10   [sic] other than I told him my personal opinion that I felt the sergeant was a thief. But that was
11   my own personal opinion. I didn't base that on any facts that I could have arrested him for.
12   There were no facts." (Richardson Decl., Ex. A (Hernandez Depo. at 79:25-80:1, 6-8)).
13   According to Hernandez's own account of that meeting, he did not report any wrongdoing by
14   Zarate to Werkema because he did not believe Zarate was violating city policy or breaking the
15   law, and he had no facts at that time to conclude that Zarate had actually done anything illegal.
16   (Id. at 59:6-19; 60:14-20; 80:7-11). His complaint about that meeting is that it gave the
17   perception that he had blown the whistle on Zarate when he says that he did no such thing. (Id.
18   at 77:11-13). And, although Hernandez says that he informed Werkema about Zarate's
19   suspected time sheet fraud during that meeting, he disclaims that he was reassigned to patrol in
20   retaliation for that statement because, by that time, others within the department had already
21   reported Zarate's alleged misdeeds. (Hernandez Decl. ¶ 25, lines 3-5). To the extent that
22   plaintiffs' claims were ever based on Hernandez's comment to Werkema that he believed Zarate
23   was "a thief," that statement is merely an expression of Hernandez's personal opinion and not a
24   matter of public concern. As to that particular statement, defendants' motion for summary
25   judgment is granted.

26   The record presented, however, indicates that Hernandez engaged in other speech about
27   Zarate's alleged misconduct. Here, Hernandez avers that he began repeating the story of
28   Zarate's time sheet fraud and his meeting with Werkema "to anyone that would listen including

11

my brothers, sisters, and civilian friends because I had a feeling that I was going to be blamed for the initial investigation against Sgt. Zarate." (Hernandez Decl. ¶ 25).

The content, form, and context as to what Hernandez said to others about Zarate are vague. To the extent that Hernandez says that he merely reiterated to others what he told Werkema, i.e., "that Sgt. Zarate was a thief and I resented being pulled into Sgt. Zarate's illegal scheme," (Hernandez Decl. ¶ 22), such statements are merely Hernandez's personal opinions of Zarate and are not matters of public concern. However, Hernandez also avers that he spoke to others, including persons outside the department, about "the public corruption that I became aware about" and "Sgt. Zarate's time sheet fraud" (Hernandez Decl. ¶¶ 3, 25). And, in deposition, Hernandez testified that during a January 2010 meeting, Alcantar said that he understood that Hernandez had been talking about Zarate and ordered him to stop in view of the investigation that had begun. (Richardson Decl., Ex. A (Hernandez Depo. at 20:23-25)). Defendants have presented no evidence to the contrary. The Ninth Circuit has said that "'[u]nlawful conduct by a governmental employee or illegal activity within a government agency is a matter of public concern.'" Huppert, 574 F.3d at 704 (quoting Thomas v. City of Beaverton, 379 F.3d 802, 809 (9th Cir. 2004)). "Furthermore, 'misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern.'" Id. (quoting Johnson v. Multnomah Cnty., 48 F.3d 420, 425 (9th Cir. 1995)). So, although plaintiffs have presented only a highly generalized description of what Hernandez claims he told unidentified others about Zarate, the court finds that Zarate's alleged time sheet fraud and alleged corruption within the SJPD are matters of public concern.

2. <u>Whether Hernandez spoke as a private citizen or as a public employee</u>

Next, plaintiffs bear "the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." Eng, 552 F.3d at 1071. "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." Id. (internal quotations and citations omitted). "While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional

12

significance of the facts as found is a question of law." Id. (internal quotations and citations omitted).

Hernandez avers that he was paid to provide visible security at the San Jose Airport and the surrounding area, and for a time, to coordinate airport overtime shifts. (Hernandez Decl. ¶¶ 11-12). Investigating alleged fraud by a superior officer, says Hernandez, was not a part of his job duties. (Id.). Although Calderon worked for a time with the SJPD's Financial Crimes Unit, she was not assigned to the investigation into Zarate's alleged time sheet fraud; she avers that she did not participate in the investigation; and neither plaintiff was interviewed by investigators. (Hernandez Decl. ¶ 40; Calderon Decl. ¶¶ 10-11). Notwithstanding plaintiffs' claim that they told "the rest of the world about Sgt. Zarate's time-card fraud" (Opp. at 19:5-7), defendants maintain that Hernandez and Calderon had an obligation as police officers to report any violations of federal, state, or local laws, as well as any provisions of the SJPD Duty Manual. The policy manuals defendants present, however, say only that officers have a duty to report such violations to a superior officer, an immediate supervisor, or other management employees. (Richardson Decl., Ex. F (City Policy Manual, Code of Ethics, § 8); Ex. G (SJPD Duty Manual, § C1402). These policy manuals do not address statements Hernandez claims he made about Zarate's alleged time sheet fraud to persons outside the SJPD. The court finds that Hernandez spoke in his capacity as a private citizen, and not a public employee.

3.   <u>Whether the protected speech was a substantial or motivating factor in the adverse employment action</u>

At the third step, plaintiffs bear the burden of showing that defendants took adverse employment action and that the speech at issue was a substantial or motivating factor in the adverse action. Eng, 552 F.3d at 1071. This inquiry is purely a question of fact. Id.

The only alleged adverse employment actions falling within the two-year limitations period are those concerning plaintiffs' claims that they were unfairly denied job assignments in the GIU and the FVU; Hernandez's claim that Lt. Aviles told him that he had to use sick time, not compensatory time, for his rehabilitation; and Calederon's claim that she was singled out and sent home when she showed up at work without her BDU. Even assuming that these events

13

1 constitute adverse employment actions,[3] plaintiffs have not presented cogent evidence creating a genuine issue of material fact that the speech at issue was a substantial or motivating factor in those events.

Plaintiffs argue that these incidents are temporally linked to comments Hernandez made during his meeting with Werkema. But, as discussed above, Hernandez's comment that he felt Zarate was a "thief" is, according to Hernandez himself, nothing more than his personal opinion. (Richardson Decl., Ex. A (Hernandez Depo. at 79:25-80:1, 5-6)). It is not protected speech. Hernandez says that he also generally spoke about Zarate's suspected time sheet fraud during that meeting. But, he now disclaims that his reassignment to the patrol team (which occurred two weeks after the meeting) was done in retaliation for those statements. (Hernandez Decl. ¶ 25, lines 3-5). Plaintiffs have not presented sufficient facts giving rise to a triable issue that the more recent events in question—which occurred years after the meeting with Werkema—are temporally linked to statements made by Hernandez at that meeting. And, to the extent plaintiffs claim that the alleged adverse employment actions are temporally linked to some other speech by Hernandez, it is not clear what that speech was, to whom it was said, or when.

Plaintiffs nevertheless maintain that retaliatory motive is demonstrated by defendants' opposition to Hernandez talking about Zarate's alleged time sheet fraud—specifically, the January 2010 meeting when the investigation into the alleged misconduct was underway and Alcantar told Hernandez that he was not to speak about Zarate. (Richardson Decl., Ex. A (Hernandez Depo. at 20:23-25)). Missing from plaintiffs' calculus is evidence showing that either Alcantar or Werkema were involved in or otherwise influenced the alleged adverse actions. Alcantar testified that he never spoke with Lt. Spicer about Calderon in the context of anything pertaining to Zarate, Hernandez, or her application for any SJPD unit that Spicer led. (Richardson Decl., Ex. D (Alcantar Depo. at 117:17-118:8)). Alcantar also testified that he

---

[3] Defendants argue that there is no evidence that any of their actions affected any tangible condition of Hernandez's or Calderon's employment. They contend that neither plaintiff had a guaranteed right to obtain placement in the GIU and FVU on the one occasion they sought those assignments. And, as discussed above, Hernandez was allowed to use compensatory time off for his rehabilitation.

14

never spoke with Spicer about Hernandez's activities relating to the SJPD. (Id. at 118:20-25). Alcantar further testified that he never spoke with Rose or Aviles about either plaintiff. (Id. at 119:7-13, 17-23). And, it is undisputed that, by the time plaintiffs applied for assignments in the GIU and FVU, Alcantar had already retired from SJPD.

Plaintiffs acknowledge that they have no direct evidence of Alcantar's or Werkema's alleged retaliatory motives. However, citing Emeldi v. Univ. of Oregon, 673 F.3d 1218, republished as amended at 698 F.3d 715 (9th Cir. 2012), plaintiffs contend that they have sufficient evidence to support an inference that Alcantar and Werkema both knew that Hernandez was continuing to speak about Zarate's alleged misdeeds and directed others within SJPD (i.e., Aviles, Spicer, Rose, and McGrady) to punish Hernandez and Calderon for it.

In Emeldi, the plaintiff, a female doctoral candidate, complained to university administrators about what she perceived to be gender discrimination by her advisor, Dr. Horner. According to plaintiff, one of those administrators, Marian Friestad, then spoke with Horner and informed him about Emeldi's complaints of discrimination—a conversation that, plaintiff claimed, caused Horner to resign as her advisor, leaving her unable to pursue her Ph.D. degree. There was no dispute that Friestad, in fact, had a conversation with Horner about Emeldi. However, the parties disagreed over what plaintiff said to Friestad and what Friestad later told Horner. Friestad maintained that Emeldi never raised concerns about discrimination during their meeting, and she further denied informing Horner of any allegations of discrimination. The Ninth Circuit held that a jury, crediting plaintiff's recollection that she specifically complained to Friestad about discrimination, could infer that Friestad passed that information on to Horner and that Horner's resignation as plaintiff's advisor (which occurred a few weeks later) was a response to plaintiff's complaint. Emeldi, 698 F.3d at 727. Hernandez and Calderon argue that if Emeldi's evidence about what she said, in what plaintiffs characterize as the "key conversation" between Emeldi and Friestad, was sufficient to give rise to an inference linking her alleged complaint and the claimed retaliatory conduct, then surely their evidence is sufficient to avoid summary judgment here.

15

The problem for plaintiffs is that there is not even a "key conversation" here. They point to Alcantar's testimony that he and Zarate were academy mates and friends who used to socialize together (Bourke Decl., Ex. A (Alcantar Depo. at 37:4-12); and Alcantar's testimony that he knew Spicer through work and would consider him a friend, but never socialized with him (Id. at 37:17-24). They also cite Werkema's testimony that Zarate had a reputation at SJPD of being "a nice guy." (Bourke Decl. Ex. B (Werkema Depo. at 39:20-24). From there, plaintiffs say the totality of the circumstances demonstrates that defendants must have done something to cause or influence the GIU and FVU test scores, Calderon's BDU issues, and Hernandez's use of compensatory time off. They say that this is true especially of the GIU and FVU tests because Calderon says she never previously failed a unit test, and both plaintiffs feel that the testing and scoring process was unfair. The evidence adduced by plaintiffs, however, is a string of conclusory and speculative assertions or hearsay, made without foundation. Plaintiffs offer the hearsay statement of two unidentified detectives who allegedly told Calderon that they believed that the GIU test scores were manipulated to keep her out of the unit (without any foundation as to how or why they believed that) (Calderon Decl. ¶ 57); Calderon's assertion that she alone was singled out with respect to the BDU issues (Id. ¶ 73); Hernandez's conclusory assertion, made without any foundation, that Aviles is Alcantar's friend (Hernandez Decl. ¶ 63); and the declaration of Sgt. Elvander, who says that Spicer told him that there was nothing plaintiffs could do to be assigned to the GIU—a statement Elvander says he understood to mean that Spicer kept plaintiffs out of the GIU because he harbored some personal animosity toward them (Elvander Decl. ¶ 6). Elvander's testimony about what Spicer said to him is hearsay. Moreover, at oral argument, plaintiffs acknowledged that Elvander did not ask Spicer why he (reportedly) said that plaintiffs could not be placed in the GIU; and, Elvander's statement about what he believed Spicer meant is a speculative conclusion about Spicer's state of mind.

"To find liability on this evidence would require undue speculation." United States ex rel Cafasso v. Gen'l Dynamics C4 Sys., Inc., 637 F.3d 1047, 1061 (9th Cir. 2011). "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not

16

sweeping conclusions." Id.; see also Emeldi, 698 F.3d at 728 ("We do not disagree with the principle that mere speculation cannot raise an issue of fact."). In sum, plaintiffs have not presented sufficient evidence creating a genuine issue of material fact that the speech at issue was a substantial or motivating factor in the claimed adverse actions. Because plaintiffs have not carried their burden at step three of the sequential analysis, the court need not address the remaining prongs of the analysis. Huppert, 574 F.3d at 703. Defendants' motion for summary judgment on plaintiffs' § 1983 claim is granted.

C.    California Constitution, Article I §§ 1 & 2

The California Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Cal. Const., art. I, § 2, subd. (a.)). Plaintiffs point out that California's free speech clause is broader and more protective than the First Amendment's free speech clause. See Kaye v. Bd. of Trustees San Diego Cnty. Public Law Library, 179 Cal. App.4th 48, 57, 101 Cal. Rptr.3d 456 (2010). However, as stated by the California Supreme Court, "'the fact that [the California] provision is worded more expansively and has been interpreted as being more protective than the First Amendment in some respects does not mean that it is broader in all its applications.'" Id. (quoting Edelstein v. City & Cnty. of San Francisco, 29 Cal.4th 164, 168, 179, 126 Cal. Rptr.2d 727, 56 P.3d 1029 (2002)). "'Generally, when we interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, we will not depart from the United States Supreme Court's construction of the similar federal provision unless we are given cogent reasons to do so.'" Id. Here, plaintiffs do not dispute that the analytical framework for their state law claim is the same as for their federal one. They have provided no reason for this court to depart from that analytical framework. Accordingly, defendants' motion for summary judgment is granted for the same reasons discussed above in connection with plaintiffs' § 1983 claim.

17

ORDER

Based on the foregoing, defendants' motion for summary judgment is granted. The clerk shall enter judgment in favor of defendants and against plaintiffs and close the file.

SO ORDERED.

Dated: August 19, 2013

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

5:12-cv-02952-HRL Notice has been electronically mailed to:

Ardell Johnson     CAO.Main@sanjoseca.gov

Nkia Desiree Richardson     cao.main@sanjoseca.gov

Paul D Ahn     CAO.Main@sanjoseca.gov

Thomas Kevin Bourke     TallTom2@aol.com